1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EMPLOYEES' RETIREMENT SYSTEM OF THE CITY OF BATON ROUGE AND PARISH OF EAST BATON ROUGE, individually and on behalf of all others similarly situated,<br><br>                        Plaintiff,<br><br>    v.<br><br>IMPINJ, INC., CHRIS DIORIO, EVAN FEIN, and ERIC BRODERSEN<br><br>                        Defendants. | No.<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>CLASS ACTION</u><br><br><u>JURY TRIAL DEMANDED</u> |

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Impinj, Inc. ("Impinj" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Impinj; and (d) other public information regarding the Company.

## INTRODUCTION

1.     This securities fraud class action is brought on behalf of purchasers of Impinj's publicly traded securities between November 3, 2016 and February 15, 2018, inclusive (the "Class Period"). The claims asserted herein are alleged against Impinj and certain of the Company's senior executives (collectively "Defendants") and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Impinj is a leading provider of "RAIN RFID" hardware and software solutions that are used by commercial and industrial clients to track and identify products. Throughout the Class Period, Impinj defrauded investors concerning the demand for its integrated circuit ("IC") tags or "endpoints" that, when attached to an individual item, enable users to determine the item's identity, location, and authenticity.

3.     Specifically, Defendants repeatedly touted increased sales and purportedly strong demand for endpoint ICs, which Defendants claimed had been driven by customers' increasing adoption of Impinj's technology. In truth, Impinj's "record breaking" revenues from 2016 to late-2017 were the result of customers stockpiling inventory to account for Impinj's production delays and concerns over extended production lead times. In fact, while Impinj was attributing increased sales to "accelerating" demand—and reassuring investors that the Company had

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                    -1-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

"confidence in the strong demand" and great "visibility" into its customers' supposedly "low" inventory levels—Impinj customers amassed between one half to one billion excess endpoint ICs.

4.     When the Company's supply constraints eventually improved, and IC endpoint lead times shortened, Impinj customers reduced their purchases, significantly reducing Impinj's sales during 2018.  The revelations of the fraud as described below caused the price of Impinj stock to decline dramatically, significantly damaging Plaintiff and the Class.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Impinj maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

7.     Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge is a defined benefit pension plan established in 1953 that provides retirement allowances and other benefits to regular employees of the City of Baton Rouge.  As of December 31, 2017, Plaintiff managed approximately $1.2 billion in assets for the benefit of its approximately 6,800 participants.  Plaintiff purchased Impinj securities during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                    -2-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

8.      Defendant Impinj is a Delaware corporation with its principal executive offices located at 400 Fairview Avenue North, Suite 1200, Seattle, Washington 98109.  The Company's primary business consists of selling software and devices that connect everyday items to business and consumer applications.  Impinj's common stock trades on NASDAQ, which is an efficient market, under the ticker symbol "PI."  As of April 30, 2017, the Company had nearly 21 million shares of stock outstanding.

9.      Defendant Chris Diorio ("Diorio") is, and was at all relevant times, the Vice Chairman and Chief Executive Officer ("CEO") of Impinj and a member of the Board of Directors.

10.     Defendant Evan Fein ("Fein") was, until he resigned effective March 30, 2018, the Chief Financial Officer ("CFO") of Impinj.

11.     Defendant Eric Brodersen ("Brodersen") is, and was at all relevant times, the President and Chief Operating Officer of Impinj.  Since Defendant Fein's departure, Defendant Brodersen has also been serving as the Principal Financial Officer of Impinj.

12.     Defendants Diorio, Fein, and Brodersen are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with Impinj, possessed the power and authority to control the contents of Impinj's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

## BACKGROUND

13.     Impinj sells integrated circuit ("IC") tags, which, when connected to an item, are called endpoints.  These endpoints function as a tag system that provides wireless information about tagged items, including information about the item's identity, location, and authenticity.  Impinj's platform connects items such as apparel, medical supplies, automobile parts, driver's licenses, food, and luggage to applications such as inventory management, patient safety, asset tracking, and item authentication, delivering real-time information to businesses about items they create, manage, transport, and sell.

14.     Impinj also sells reader ICs that enable wireless communication with the tag ICs.  Original equipment manufacturing customers typically place large orders for reader ICs for use in their products and often secure supply for an extended period of time.  Impinj also sells gateway systems that allow tag ICs to be scanned while in motion, such as when the item passes through a hallway, and employs software to manage the information and process.  The Company's customers include large commercial enterprises such as Wal-Mart and Microsoft.

## DEFENDANTS DEFRAUD INVESTORS

15.     Throughout the Class Period, Impinj defrauded investors regarding the level of demand for its IC tags.  On November 3, 2016, the first day of the Class Period, Impinj announced the Company's financial results for the third quarter of 2016.  During the earnings conference call Impinj held on that day, CFO Fein reported revenue of $31 million, which represented "50% growth over the third quarter of 2015 and 19.3% growth over the prior quarter."  According to the Company, this quarterly growth "was driven primarily by increasing demand for our endpoint ICs, followed by growing demand for our connectivity products."  Because of this supposed increase in demand, Impinj estimated endpoint IC sales for 2016 to be between 5.6 billion and 5.8 billion units—a significant increase from prior estimates of 4.9 billion to 5.1 billion units.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                          -4-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

16.     CEO Diorio told investors during the November 3 conference call that Impinj views "endpoint IC volumes as an indicator of RAIN market adoption" and the Company is "excited by the accelerating demand we are seeing."  In fact, during that same conference call, Defendants reassured investors concerning the Company's ability to asses demand from its customers.  According to CFO Fein, "[w]e use several methods to conduct inventory levels" and "work[] closely with our largest inlay customers, and we're in a position now where our customers are desiring their endpoint ICs in very rapid fashion, so we feel comfortable that inventory levels are low."  Defendant Fein added that the "visibility we've got, combined with the short lead time orders we're seeing from many of those customers, give us real confidence in the strong demand."

17.     The statements set forth in ¶15-¶16 were materially false and misleading.  In truth, the Company's reported earnings were not driven by "accelerating" demand for the Company's products nor increased market adoption of endpoint ICs.  Rather, Impinj's sales were the result of customers stockpiling product in response to the Company's supply constraints and long lead times.  As a result of customer stockpiling, Impinj's customers' inventory levels were anything but "low" and, in fact, far exceeded actual end-user demand.

18.     On February 16, 2017, Impinj held its earnings call for its fourth quarter of 2016.  During this call, CFO Fein reported revenue of $33.7 million, a figure that was "ahead of our guidance and representing 49% growth over the fourth-quarter of 2015."  Fein further touted that this growth "was driven primarily by increasing demand for our endpoint ICs."  According to Defendant Fein, "[f]or the full year, we grew revenue 43% to reach $112.3 million" and that Impinj's "endpoint IC volume for the year grew to $6 billion, roughly a 70% increase over the prior year's $3.5 billion."  For 2016, the endpoint ICs represented 77% of the Company's total revenues.

19.     Significantly, CEO Diorio told investors during the February 16, 2017 earnings call that, "[a]s we've noted in prior calls, we view endpoint IC volumes as an indicator of RAIN

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                    -5-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

market adoption and are excited by the demand we're seeing." According to CFO Fein, this continued demand would translate into sales of between 7.8 and 8 billion endpoint ICs in 2017. Defendant Fein concluded, "[w]e remain on track to reach our target model in 2019 to 2020 with endpoint IC revenue greater than 60% of our total."

20.     The statements set forth in ¶18-¶19 were materially false and misleading. In truth, the Company's revenue growth was not driven by increased demand for Impinj's endpoint ICs, the Company's endpoint IC volumes were not an accurate indicator of RAIN market adoption, and Impinj was not on track to reach its revenue target model in 2019 to 2020. In reality, the Company's reported sales of endpoint ICs reflected purchases by Impinj customers that greatly exceeded actual end-user demand, *i.e.*, customers stockpiling product, in response to the Company's long lead times and supply constraints.

21.     On May 4, 2017, during the Company's earnings call for its first quarter of 2017, Impinj reported another "strong" quarter, with revenue of $31.7 million, representing 47% growth over the first quarter of 2016. According to CFO Fein, the "growth was driven primarily by the team's strong execution and the market's continued adoption of our platform." Impinj reaffirmed its prior guidance of between 7.8 and 8 billion endpoint ICs, with CEO Diorio telling investors that, if anything, this guidance was conservative because it did not assume that several significant sales the Company had the prior year would be repeated.

22.     When analysts directly questioned the Company about the drivers of Impinj's own increasing inventory levels during the May 4 earnings call, Impinj executives claimed those increases were necessary to meet growing customer demand. Defendant Diorio told investors that the Company was increasing its own inventory to establish a "position that meets the demands of our market [and] the timing needs of our customer," and that the "momentum and the demands are so great, we're going to invest even more in the inventory in the second quarter." CFO Fein similarly explained that these inventory increases were appropriate because the Company had strong insight into end-user demand from discussions with its customers, and

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

that the inventory levels at Impinj's customers were appropriate.  Specifically, Fein told investors that "we have an array of endpoint IC customers that we keep in regular contact with" including "relationships at all levels of those customers, meaning both executive and kind of in the line and managerial level.  And based on those checks, we feel very good about the inventory levels at those places."

23.     The statements set forth in ¶21-¶22 were materially false and misleading.  Impinj's growth was not driven by continued market adoption of its products.   Impinj's increasing inventory levels were also not necessary to meet increased customer demand.   In truth, the Company's reported sales reflected customers purchasing excess inventory to account for Impinj's extended production lead times.  Specifically, rather than maintain appropriate levels of inventory, Impinj customers in fact amassed between one-half to one billion excess endpoint ICs—inventory levels that were far in excess of actual demand and that would require a subsequent inventory drawdown that would negatively impact sales going forward.

## THE TRUTH BEGINS TO BE REVEALED

24.     The first indication that Impinj had misled investors came on August 3, 2017, when the Company reduced its full-year forecasts, citing delays in planned expansions at several large customers.  Specifically, CFO Fein disclosed during the Company's earnings call for the second quarter of 2017 that Impinj expected third quarter 2017 revenue to be in the range of $31.75 million to $33.25 million, or up just 4.6% year-over-year.  Defendant Diorio added that Impinj was reducing its full year 2017 endpoint IC guidance from between 7.8 billion and 8.0 billion units to between 7.0 billion and 7.2 billion units—projecting approximately half the growth it provided the prior quarter.

25.     CEO Diorio falsely assured investors on August 3 that the reduction was caused by "several large end customers delaying planned expansions" that were "due primarily [] to internal process and integration challenges at their end."  CFO Brodersen similarly stated that the decline was due to customers' internal issues, as opposed to a significant decline in demand.

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

Despite Defendants' false assurances, the price of the Company's stock declined from $47.92 per share on August 3, 2017 to $37.52 per share on August 4, 2017, or approximately 22%.

26.     On November 1, 2017, the Company announced earnings for the third quarter 2017, and disclosed that it lowered fourth quarter guidance due to "a decline in endpoint IC demand."   During Impinj's earnings call held that day, Defendant Fein revealed that the Company recorded third-quarter revenue of $32.6 million, representing only 5% growth over the third quarter of 2016.   Impinj's guidance was even more disappointing, as Defendant Fein revealed that the Company revised fourth quarter revenues sharply downward and expected "non-GAAP earnings to be a loss between $4.95 million and $3.45 million."

27.     According to Impinj, the Company's fourth quarter outlook was "impacted by a decline in endpoint IC demand," with Defendant Diorio explaining that the reduced demand was attributable to customers "adjusting from a transition where we had constrained supply and long lead times to us having a buffer stock in short lead times now."   In fact, Diorio revealed that, in the prior year, "we didn't have enough product [and] so we have long lead times, and we see a normalization happening now as we accommodate basically a new dynamic where we have sufficient product to meet the demand."   This news caused the price of Impinj stock to decline from $32.80 per share on November 1, 2017 to $21.55 per share on November 2, 2017, or approximately 34%.

28.     Then, on February 1, 2018, Impinj pre-announced fourth quarter 2017 earnings, disclosing that it expected revenue to miss even the reduced guidance it provided just weeks earlier.   CEO Diorio stated that the sales reduction was driven by a massive inventory backlog, explaining that the Company's "shortened endpoint IC lead times have contributed to a reduction in our endpoint IC order backlog as well as ongoing reductions in inlay-partner inventory."   As a result, "despite continued growth in endpoint IC consumption and in the number of deployments by end users, we currently anticipate softness in our endpoint IC volumes and first quarter revenue of $20 to $22 million."   Impinj also reported that long-time CFO Fein would resign

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                    -8-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

effective March 30, 2018.  The revelation of this massive inventory backlog—a state of affairs that was completely inconsistent with the Company's prior assurances that endpoint IC customer inventory levels were "low" and that demand was "strong"—caused the price of the Company's stock to decline nearly 47%, from $22.86 per share on February 1, 2018 to $12.16 per share on February 2, 2018.

29.     Two weeks later, during the Company's earnings call for the fourth quarter of 2017 held on February 15, 2018, Impinj disclosed fourth quarter revenue of just $26.9 million—a decrease of $6.8 million from the fourth quarter of 2016, and below the preliminary estimate of $29.5 million the Company announced in its February 1 pre-announcement.  CFO Fein revealed that after the pre-announcement, Impinj agreed to a customer's request for a onetime product exchange, requiring the Company to take an accounting reserve and decrease fourth quarter 2017 revenue by $3.2 million.  According to the Company, the shortfall was primarily due to the 33% decline in endpoint IC revenue resulting from the continued "inventory drawdown at our inlay partners."  Worse, Impinj disclosed that the inventory drawdown would continue to impact revenues for at least the first two quarters of 2018 and had such a drastic effect on the Company's financial position that Impinj had been forced to take significant measures to reduce costs, including by firing employees, reducing product development, halting office expansion and closing several remote offices.

30.     As CEO Diorio explained on Impinj's February 15, 2018 earnings call, "endpoint IC lead times have contracted from an average of 10 to 12 weeks in 2016 to an average of 4 to 6 weeks today.  As a consequence, we have seen a significant reduction in our order backlog, and we expect our inlay partners to further reduce their inventory by between 500 million and 1 billion units, mostly in the first and second quarters.  As a result, even though we anticipate 15% to 20% growth in end user endpoint IC consumption in 2018, our first half 2018 unit volume growth will lag end user consumption."  On this news, the price of the Company's stock declined

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                    -9-

from $13.43 per share on February 15, 2018 to $11.07 per share on February 16, 2018, or nearly 18%.

## LOSS CAUSATION

31.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Impinj securities and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on August 3, 2017, November 1, 2017, February 1, 2018, and February 15, 2018, the price of Impinj securities fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Impinj securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the securities of Impinj during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Impinj and their families and affiliates.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of April 30, 2017, there were 21 million shares of Impinj stock outstanding, owned by hundreds or thousands of investors.

34.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.     Whether Defendants violated the Exchange Act;

B.     Whether Defendants omitted and/or misrepresented material facts;

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                    -10-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

C.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.    Whether the price of Impinj securities was artificially inflated;

F.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.    The extent of damage sustained by Class members and the appropriate measure of damages.

35.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

36.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

37.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**INAPPLICABILITY OF STATUTORY SAFE HARBOR**

38.    Impinj's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  Indeed, those warnings were themselves misleading because they presented as potential risks conditions that already existed or were known to be imminent when the warnings were made.

39.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Impinj who knew that the statement was false.  None of the historic or

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                    -11-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

40.    At all relevant times, the market for Impinj's securities was an efficient market for the following reasons, among others:

A.    Impinj stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

B.    As a regulated issuer, Impinj filed periodic public reports with the SEC and NASDAQ;

C.    Impinj regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.    Impinj was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).   Each of these reports was publicly available and entered the public marketplace.

41.    As a result of the foregoing, the market for Impinj securities promptly digested current information regarding Impinj from all publicly available sources and reflected such information in the price of Impinj securities.   Under these circumstances, all purchasers of Impinj

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS
-12-

securities during the Class Period suffered similar injury through their purchase of Impinj securities at artificially inflated prices and the presumption of reliance applies.

42. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the true demand for the Company's IC tags—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Impinj's IC tags to the Company's business, as set forth above, that requirement is satisfied here.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

43. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

44. During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Impinj securities at artificially inflated prices.

45. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Impinj securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

46.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

47.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

48.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Impinj's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

49.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Impinj securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Impinj securities had been artificially inflated by Defendants' fraudulent course of conduct.

50.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

51.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

52.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                    -14-

BYRNES & KELLER LLP
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000

53.     The Individual Defendants acted as controlling persons of Impinj within the meaning of Section 20(a) of the Exchange Act.   By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Impinj, the Individual Defendants had the power and ability to control the actions of Impinj and its employees.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

54.     WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

55.     Plaintiffs demands a trial by jury.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

-15-

Dated: October 2, 2018

Respectfully submitted,

**BYRNES & KELLER LLP**

*/s/ Bradley S. Keller*
Bradley S. Keller, WSBA# 10665
1000 Second Avenue, 38th Floor
Seattle, Washington 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
bkeller@byrneskeller.com

*Liaison Counsel for Plaintiff Employees'*
*Retirement System of the City of Baton*
*Rouge and Parish of East Baton Rouge*

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Avi Josefson
Michael D. Blatchley
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
avi@blbglaw.com
mikeb@blbglaw.com

*Counsel for Plaintiff Employees' Retirement*
*System of the City of Baton Rouge and*
*Parish of East Baton Rouge*

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

-16-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2018, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Bradley S. Keller*
Bradley S. Keller, WSBA# 10665

*Liaison Counsel for Plaintiff Employees'
Retirement System of the City of Baton
Rouge and Parish of East Baton Rouge*

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS                    -17-

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Jeffrey R. Yates, on behalf of the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Baton Rouge"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Retirement Administrator of Baton Rouge. I have reviewed this complaint and Baton Rouge has authorized its filing.

2. Baton Rouge did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Baton Rouge is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Baton Rouge fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. Baton Rouge's transactions in the Impinj, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Baton Rouge sought to serve as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Employees' Retirement System of the City of Baton Rouge and Parish or East Baton Rouge v. Aaron's Inc.*, No. 17-cv-2270 (N.D. Ga.)

6. Baton Rouge has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Fresno County Employees' Retirement Association v. comScore, Inc.*, No. 16-cv-1820 (S.D.N.Y.)

7. Baton Rouge will not accept any payment for serving as a representative party on behalf of the Class beyond Baton Rouge's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of October, 2018.

_____
Jeffrey R. Yates
Retirement Administrator
*Employees Retirement System of the City of Baton Rouge and Parish of East Baton Rouge*

**Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge Transactions in Impinj, Inc.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 3/2/2017 | 683 | 29.1169 |
| Purchase | 3/3/2017 | 1,116 | 28.8617 |
| Purchase | 3/6/2017 | 1,131 | 27.9394 |
| Purchase | 3/7/2017 | 539 | 27.5225 |
| Purchase | 3/7/2017 | 903 | 27.2280 |
| Purchase | 3/8/2017 | 790 | 27.6832 |
| Purchase | 3/9/2017 | 271 | 27.7914 |
| Purchase | 3/10/2017 | 1,149 | 28.0550 |
| Purchase | 3/13/2017 | 463 | 28.5380 |
| Purchase | 3/14/2017 | 1,175 | 28.1923 |
| Purchase | 3/15/2017 | 758 | 28.4111 |
| Purchase | 3/21/2017 | 956 | 28.6956 |
| Purchase | 3/22/2017 | 838 | 28.2201 |
| Purchase | 5/11/2017 | 1,274 | 39.2093 |
| Purchase | 6/27/2017 | 1,235 | 53.1129 |
| Purchase | 6/28/2017 | 304 | 53.5644 |
| Purchase | 7/26/2017 | 183 | 52.8155 |
| Purchase | 7/27/2017 | 874 | 51.5237 |
| Purchase | 7/28/2017 | 1,125 | 50.4121 |
| Purchase | 7/31/2017 | 1,110 | 49.2872 |
| Purchase | 8/2/2017 | 469 | 48.7199 |
| | | | |
| Sale | 7/19/2017 | (743) | 51.1906 |
| Sale | 8/10/2017 | (866) | 34.0060 |
| Sale | 8/11/2017 | (1,581) | 34.0401 |
| Sale | 8/14/2017 | (203) | 34.0148 |
| Sale | 8/15/2017 | (641) | 32.0742 |
| Sale | 10/3/2017 | (360) | 39.6956 |
| Sale | 10/4/2017 | (1,020) | 40.1980 |
| Sale | 10/5/2017 | (94) | 40.3494 |
| Sale | 10/9/2017 | (17) | 38.0553 |
| Sale | 10/10/2017 | (92) | 38.0010 |
| Sale | 10/12/2017 | (44) | 38.0000 |
| Sale | 10/13/2017 | (137) | 36.6635 |
| Sale | 10/16/2017 | (251) | 35.0832 |
| Sale | 11/2/2017 | (5,538) | 22.1020 |
| Sale | 12/4/2017 | (1,305) | 23.0324 |
| Sale | 12/12/2017 | (818) | 23.6985 |
| Sale | 12/13/2017 | (312) | 23.5365 |
| Sale | 12/20/2017 | (317) | 23.6655 |
| Sale | 12/20/2017 | (352) | 23.7143 |
| Sale | 12/21/2017 | (649) | 23.4024 |
| Sale | 12/22/2017 | (622) | 22.8240 |
| Sale | 12/26/2017 | (752) | 21.9377 |
| Sale | 12/27/2017 | (632) | 22.4542 |